IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. JFM-09-1049 |
| | * | |
| | * | |
| CITY OF BALTIMORE, | * | |
| Defendant | ****** | |
| | | |
| BALTIMORE CITY SUBSTANCE | * | |
| ABUSE DIRECTORATE, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. JFM-09-1766 |
| | * | |
| | * | |
| MAYOR AND CITY COUNCIL | * | |
| OF BALTIMORE, | ****** | |
| Defendant | | |

OPINION

Plaintiffs, the United States ("Department of Justice" or "DOJ") and the Baltimore City Substance Abuse Directorate ("BCSAD"), bring related actions against Defendant, City of Baltimore ("the City"). In both cases it is alleged that the City of Baltimore Zoning Code discriminates against individuals receiving treatment in residential substance abuse treatment programs ("RSATPs") in violation of Title II of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12131 et seq., and the Fair Housing Act ("FHA"), as amended, 42 U.S.C. §§ 3604(f)(1) et seq.[1] Now pending are Plaintiffs' motion for partial summary judgment

---

[1] DOJ only alleges a violation under the ADA; BCSAD alleges a violation under both the ADA and FHA. In this context, a claim under the ADA is almost identical to one brought under the FHA. *See, e.g.*, *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 573 n.4 (2d Cir. 2003) (noting "no material differences" between the ADA and FHA with respect to a claim of zoning

and the City's cross-motion for summary judgment. Plaintiffs request that this Court declare that a provision of the City's Zoning Code allegedly requiring a conditional ordinance ("CO") for locating RSATPs, is facially invalid under the ADA and FHA.[2] The City requests that this Court declare that the provision at issue does not facially discriminate against RSATPs in violation of the ADA and FHA.

For the reasons discussed below, I grant Plaintiffs' summary judgment motions and deny the City's. However, I find that although the provision in the Zoning Code requiring that "homes for the rehabilitation of non-bedridden alcoholics" seek and obtain a CO is overbroad and discriminatory, I find that only a small group of RSATPs have been adversely affected by its application. Therefore, instead of striking the provision I will order that the language of the Code be amended by legislation enacted by the Baltimore City Council or by order of this Court, to reflect that the requirement of a CO does not apply to RSATPs that house 16 or fewer substance abusers at one time.

---

discrimination). All references to the ADA and FHA throughout this opinion are to the amended version of the statutes.

[2] Plaintiffs also contend that the community approval practices attendant to the CO requirement are facially discriminatory. This contention is without merit. BCSAD openly admits that the alleged requirement to formally gain community approval cannot be found anywhere in the language of the Code. (BCSAD Mem. Supp. Mot. Summ. J. 10). Moreover, BCSAD only cites two cases, *Smith-Berch, Inc. v. Baltimore Cnty.*, 68 F. Supp. 2d 602 (D. Md. 1999) ("*Smith-Berch I*"), and its later counterpart, *Smith-Berch, Inc. v. Baltimore Cnty.*, 115 F. Supp. 2d 520 (D. Md. 2000) ("*Smith-Berch II*"), to support the assertion that the court need not find a written community approval process "because courts have struck down even unwritten practices that were regularly imposed on populations with disabilities." (BCSAD Mem. Supp. Mot. Summ. J. 46). While the court in these cases did hold that the unwritten, ad hoc requirements at issue were discriminatory, they were not held to be *facially* discriminatory. *Smith-Berch II*, 115 F. Supp. 2d at 523-24. In fact, as the City points out, the words "facial" or facially" do not appear in either opinion. (City Mem. Supp. Cross-mot. Summ. J. 77). Thus, a facial challenge to the alleged community approval practices fails as a matter of law.

# I.   BACKGROUND

### A. *The Baltimore City Zoning Code*

The Mayor and City Council established the Zoning Code in 1971 to, among other things, "encourage the most appropriate use of land throughout the City." Zoning Code § 1-401(9). To accomplish this, Baltimore is divided into several zoning districts. *Id*. § 2-201 et seq. Four types of districts form the basis of Baltimore's zoning scheme: residential (ten districts, R-1 through R-10); office/residential (one district, O-R); business (five districts, B-1 through B-5); and industrial/manufacturing (three districts, M-1 through M-3). *Id.* Within each zoning district the Code delineates (1) land uses permitted as-of-right, (2) conditional land uses that require approval of the Board of Municipal and Zoning Appeals ("Board approval"), and (3) conditional land uses that require passage of an ordinance by the Mayor and City Council of Baltimore ("Conditional Ordinance" or "CO"). *Id*. § 3-101 et seq. Thus, for each district, the Code outlines the zoning approval mechanism for each land use authorized to locate in that district. If a land use is not mentioned, either as a permitted use as-of-right or as a conditional use, it cannot locate in that district. *Id*. § 3-106.

The Zoning Administrator is the principal officer vested with the power to administer and enforce the Code through granting and denying use permits. *Id.* § 2-101, 2-103 et seq. A use permit is required before an individual may: (1) occupy any newly constructed structure or any addition to a previously constructed structure, (2) use for any purpose any previously vacant land, or (3) make any changes in the authorized use of any land or structure. *Id*. § 2-402. To obtain a use permit, an individual files an application with the Zoning Administrator. *Id*. § 2-403. The Administrator evaluates the application by interpreting the Code to see whether or not the proposed land use in the application is authorized in the particular district in which it seeks to

3

locate, and if so, whether it is a land use permitted as-of-right or a conditional land use. *Id*. § 2-301. Therefore, the amount of process required to obtain a use permit depends on how the Administrator labels the proposed land use and what the Administrator believes is required under the Code for that land use to locate in the desired zoning district. For example, if the Administrator labels the proposed land use as a single-family dwelling—defined as an individual, two or more related people, or a group of not more than four unrelated persons, living together as a single unit—it will be treated as an application proposing a land use that is permitted as-of-right in all residential districts. *Id*. §§ 4-2014–4-1301. A zoning permit for land uses permitted as-of-right usually involves very little process and can be obtained the same day the application is filed. (Tanner Dep. 26:11–29:5, July 27, 2010, ECF No. 48-5.) Conditional land uses, however, are "subject to review and approval and to the imposition of conditions and restrictions" and therefore require a more involved process. Zoning Code § 3-103.

In each district, the City identifies which land uses are conditional uses. Before issuing a permit for a conditional use, the impact of the land use on the surrounding community is assessed. *Id*. § 14-101(b). The City employs two mechanisms to perform this assessment. Some conditional land uses require approval by the Board of Municipal and Zoning Appeals ("Board approval"). *Id*. §§ 14-102(1), 14-201 et seq. Board approval requires a hearing and usually takes about six weeks before a permit is issued. (Tanner Dep. 29:6–14.) Other conditional uses require a conditional ordinance ("CO") before a permit is issued. Zoning Code §§ 14-102(1), 16-101 et seq. Conditional uses that require a CO include adult entertainment establishments, adult book stores, community correctional centers, convalescent, nursing, and rest homes, drug stores and pharmacies, auditoriums, hospitals (CO required in all but five districts where permitted as-of-right), and homes for the rehabilitation of non-bedridden alcoholics or homeless

4

persons ("homes for non-bedridden alcoholics"). *Id.* §§ 14-341, 14-346, 14-351, Table of Zoning Uses 427-79.

The CO requirement is more burdensome than Board approval. It requires a process that can extend for months. (Tanner Dep. 21:25–23:16, 30:25–31:10.); Baltimore City Dept. of Planning, <u>Development Guidebook: Requirements for Building in Baltimore City</u> 14-16 (updated Nov. 17, 2010), ECF No. 48-7. First, the City Council member of the district where the proposed land use seeks to locate must introduce a bill to the City Council. Zoning Code § 16-201. Second, alongside the bill, the applicant must submit a written statement that informs the City Council, the agencies to which the proposed ordinance is referred, and the public, of the intended land use. *Id*. § 16-202. Third, the applicant must post a notice of the requested authorization on the property. *Id.* § 16-203. Fourth, the City Council must refer the bill to various agencies and obtain from them written reports and recommendations on the proposed land use. *Id*. § 16-301 et seq. Fifth, a City Council committee must hold a public hearing to consider the bill. *Id*. § 16-401 et seq. Sixth, the bill must receive a favorable City Council vote on two separate readings. *Id.* § 16-404. Seventh, the City Council will conduct a final vote on a third reading of the bill. *Id*. Lastly, if the bill obtains a favorable vote, it will go to the Mayor for final approval. *Id*.

B. *RSATPs and Plaintiff BCSAD*

Baltimore City Substance Abuse Directorate ("BCSAD") is a non-profit member organization made up of drug treatment and prevention programs, nine of which are RSATPs serving the Baltimore community. (BCSAD Mem. Supp. Mot. Summ. J. 4.) RSATPs are certified, or licensed, by the state of Maryland. *See* Md. Code Regs ("COMAR") 10.47.04.03

5

(state certification required for all programs providing drug and alcohol treatment, care, and rehabilitation). They provide substance abuse treatment and services in a residential setting. (BCSAD Mem. Supp. Mot. Summ. J. 4 n.4.) This combination of treatment and housing distinguishes RSATPs from supportive housing, which has a residential component, but no treatment, and outpatient facilities, which involved treatment, but have no residential component. *Id.*

Not all RSATPs are alike; rather, they "span a continuum" based on the level of services offered to the patients at the facility. COMAR 10.47.01.02. Maryland law dictates that RSATPs admit only those individuals who satisfy the established American Society of Addiction Medicine ("ASAM") criteria established for the level of services offered at that particular RSATP. *Id*. at 10.47.01.04 (A)(4). As the level of the patients' impairment increases, so too does the level of care and services provided. For example, a Level III.7 facility, the highest level, is equivalent to an inpatient treatment facility, providing around-the-clock observation, monitoring, and treatment. *Id.* at 10.47.02.09. Even the lowest level facilities, however, serve individuals who are "not ready to return to family or independent living." *Id*. 10.47.02.06.

## C. *Locating an RSATP Under the Code*

Plaintiffs contend that RSATPs are deemed to be "homes for non-bedridden alcoholics" under the Zoning Code.[3] As discussed below, the record indicates the City treats RSATPs that

---

[3] The term "home for non-bedridden alcoholics" seems archaic and is jarring to the modern ear. Ironically, it appears that the language was added to the Zoning Code in 1962 as a liberalization measure. Prior to that time, there was no provision in the Code authorizing such a use, and Flynn House, an organization providing services for recovering alcoholics, had been required to close two facilities. Flynn House had good relations with its neighbors, and its president advocated inclusion in the Zoning Code of the "homes for non-bedridden alcoholics" provision

do not self-identify as RSATPs in their zoning applications, as something other than a "home for non-bedridden alcoholics" if they fall into another zoning classification, e.g., "single family dwelling." The City cannot, however, refute Plaintiffs' contention that generally RSATPs are deemed to be "homes for non-bedridden alcoholics" for zoning purposes. *See, e.g.*, Letter from Deppa Bhattacharyya, City of Baltimore Law Dep't, to President and Members of the City Council of Baltimore (Mar. 19, 2008), ECF No. 48-19 ("Currently, for every zoning district in which one of these residential [drug treatment] programs would be permitted to locate, the passage of a City Council ordinance is required."). Moreover, the City itself admits that 17 RSATPs have secured the required CO and located as "homes for non-bedridden alcoholics." (City Mem. Supp. Cross-mot. Summ. J. 6.) Of course, literally an RSATP is not a "home for non-bedridden alcoholics" unless at least two of its residents are being treated for alcoholism, rather than abuse of another substance, but the history of the Code seems to explain how the terms became interchangeable. It appears undisputed that after the land use classifications "Drug Abuse Rehabilitation and Treatment Center" and its successor "Substance Abuse Treatment Center" were removed from the Zoning Code, "Homes" remained the only relevant land use and therefore took on a broader meaning. As the City explains, "in 1994 the use Drug Abuse Rehabilitation and Treatment Center was renamed to Substance Abuse Treatment Center. In 1999, the Zoning Code underwent a largely non-substantive re-draft, during which the definition of Substance Abuse Treatment Center was amended to allow only 'nonresidential' components. The rationale for the change was that a residential use could be accommodated by the land use 'Home for Non-Bedridden Alcoholics.'" (City Mem. Supp. Cross-mot. Summ. J. 26.)

---

so that a facility providing services for recovering alcoholics could be located in residential and residential-and-office use districts.

As a matter of practice, however, the record establishes that with only one exception, the CO requirement has been applied only to RSATPs that house 17 or more persons.[4]  It is undisputed that the City, through the Zoning Administrator, has allowed several RSATPs to locate as single-family dwellings, multiple-family dwellings, or other land uses that do not require a CO.  (City Mem. Supp. Cross-mot. Summ. J. 6–7; *see* Tanner Dep. 40:22–45:16, 47:12–48:24, 73:4–74:5 77:3–78:5, 132:12–133:2; Veale Dep. 21:15–25:11.)  For example, Faith House 1 was issued a permit as a single-family dwelling, and Baltimore Crisis Response, Inc. was issued a permit as a 38-dwelling unit, multiple-family dwelling.  (City Mem. Supp. Cross-Mot. Summ. J. 7.)  Likewise, at oral argument, counsel for the City stated, without contradiction from Plaintiffs' counsel, that if it meets the applicable zoning requirements, an RSATP can be classified as a "rooming house" for zoning purposes.[5]  Additionally, in 2007 the City developed a written reasonable accommodation policy.  (City Mem. Supp. Cross-Mot. Summ. J. 19; City of Baltimore, Office of the Zoning Adm'r, *Reasonable Accommodations Policies and Procedures* ("Reasonable Accommodation Policy"), ECF No. 96-30; City of Baltimore, Press Release, *Mayor Dixon Unveils New City Policy to Promote Better Access to Housing for Persons With Disabilities,* Mar. 30, 2007, ECF No. 48-42.)  Under that policy, the Zoning Administrator has the discretion to allow certain types of land uses to locate where the Code prohibits them from doing so, or to permit certain types of land uses to locate without fulfilling certain

---

[4] The one exception is the Powell Recovery Center, which, despite the fact that it houses only 10 people, was required in 2005 to locate under the "homes for non-bedridden alcoholics" classification and obtain a CO.  It did successfully obtain the CO.

[5] The distinction between a "rooming house" and a "multiple-family dwelling," as described during the course of oral argument, seems to be that a multiple-family dwelling is itself a fully functional unit while a rooming house shares one or more functional facilities, e.g. a kitchen.  Thus, eight unrelated people may reside in two separate multiple-family dwelling units or in a single rooming house.  *Compare* Zoning Code §§ 1-185, 1-186, *with* Zoning Code §§ 1-136(c)(3), 1-137, 1-142.

requirements mandated by the Code. *See* Reasonable Accommodation Policy at 2. With respect to RSATPs, the reasonable accommodation has been implemented to, for example, allow facilities to locate as a single-family dwelling even though the facility does not abide by the single-family dwelling limit of four unrelated cohabitants. (City Mem. Supp. Cross-Mot. Summ. J. 7.) According to the City, 22 RSATPs have located under the reasonable accommodation policy. *Id.*

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that might affect the outcome of the suit under the governing law. *Id.* at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 249. Accordingly, summary judgment is inappropriate if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see JKC Holding Co., LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

The moving party bears the burden of showing there is no genuine issue as to any material fact. *See Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). The

moving party can meet this burden by demonstrating the absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party must then demonstrate specific facts showing that a genuine issue remains for trial. *Id.* at 324. When ruling on a motion for summary judgment, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted). Because the parties in this case have filed cross-motions, the court must extend the required favorable inferences to each when considering the other's motion. *See McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 687 (7th Cir. 1991).

### III.   ANALYSIS

This is a case of first impression. No court in the Fourth Circuit has ever heard a facial challenge to a zoning provision similar to the one at issue here. While there have been cases involving specific permit denials or as-applied challenges to zoning regulations, a facial challenge to a particular land-use zoning provision has yet to come before the Fourth Circuit. *Cf. United States v. S. Mgmt. Corp.*, 955 F.2d 914 (4th Cir. 1992) (specific actions of an apartment manager); *Pathways v. Town of Leonardtown, Md.*, 133 F. Supp. 2d 772 (D. Md. 2001) (specific denial of occupancy permit); *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 911 F. Supp. 918 (D. Md. 1996) (specific denial of zoning exemption); *Potomac Group Home Corp. v. Montgomery Cnty., Md.*, 823 F. Supp. 1285 (D. Md. 1993) (unique neighbor notification

requirement challenged); *Smith Berch, Inc. v. Baltimore Cnty., Md.*, 115 F. Supp. 2d 520 (D. Md. 2000) (specific denial of zoning permit).

    A.  *Baltimore Zoning Code Falls Within the Scope of the ADA and FHA*[6]

Courts have long recognized the importance of local land-use planning laws and therefore often give substantial deference to municipal zoning schemes. *See, e.g.*, *Hovsons, Inc. v. Township of Brick*, 89 F. 3d 1096, 1106 (3d Cir. 1996) (citing *Village of Belle Terre v. Boraas*, 416 U.S. 1, 7–8 (1974)); *Doe v. City of Butler, Pa.*, 892 F.2d 315, 318 (3d Cir. 1989) (acknowledging that states have "a substantial interest in enforcing [their] zoning code and that, under appropriate circumstances, local zoning codes are entitled to considerable amounts of deference"). Such deference, however, does not place municipal zoning laws beyond the purview of federal statutory protections such as the ADA and the FHA. *See* ADA, as amended, 42 U.S.C. § 12132 et seq., and FHA, as amended, 42 U.S.C. §3604(f)(1) et seq.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, under the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is . . . made available . . . or any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1). Under the ADA and FHA, a public entity such as the City of Baltimore is

---

[6] Due to the statutes' similarities, and the fact that both apply to municipal zoning provisions, courts often analyze them in tandem. *See, e.g.*, *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 573 n.4 (2d Cir. 2003).

11

prohibited from implementing a zoning scheme that treats disabled individuals differently than non-disabled individuals.  *See, e.g.*, *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 305 (3d Cir. 2007) (invalidating zoning regulations under the ADA); *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996) (noting Congress's explicit intent to have the FHA apply to zoning laws); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1498 (10th Cir. 1995) (stating that the FHA, as amended, applies to "land-use regulations, restrictive covenants, and conditional or special use permits"); *Start, Inc. v. Baltimore Cnty., Md.*, 295 F. Supp. 2d 569, 575 (D. Md. 2003) ("Numerous precedents establish that the administration of zoning laws is a 'service, program, or activity' within the meaning of the statute.") (internal citation omitted).  More importantly to this case, courts have found ADA and FHA violations not only in cases of specific zoning actions such as outright permit denials, but also in cases of burdensome procedural zoning requirements uniquely placed on disabled individuals.  *See, e.g.*, *Bangerter*, 46 F.3d at 1498–99 (unique 24-hour supervision requirement placed on home for mentally handicapped); *Potomac Group Home Corp.*, 823 F. Supp. at 1297 (neighborhood notification and public hearing requirement led to disparate impact on disabled elderly); *Stewart B. McKinney Found. v. Town Plan and Zoning Comm'n*, 790 F. Supp. 1197 (D. Conn. 1992) (special exception requirement placed on foundation seeking to locate home for HIV-infected individuals as a two-family residence held to be a violation).

  B.  *RSATP Residents are "Disabled" Under the ADA and "Handicapped" Under  the FHA*

The City does not appear to dispute that RSATP residents fulfill the statutory criteria for protection under the ADA and FHA.  The City openly admits that drug addiction is considered a kind of mental illness, (City Mem. Supp. Cross-Mot. Summ. J. 32), and in 2008 George Nilson,

the City Solicitor, stated in a memo that residents of RSATPs are protected by the ADA. (Nilson Mem., Feb. 12, 2008, ECF No. 48-21.)

The City's position is appropriate and correct. Under the ADA, as amended in 2009, a person is considered "disabled" if the person suffers from "a physical or mental impairment that substantially limits one or more of the [person's] major life activities." 42 U.S.C. § 12102(2). Under the FHA, as amended in 1988, the definition of the protected class of persons is identical except the person is referred to as "handicapped." 42 U.S.C. § 3602(h). Both Acts specifically exempt from protection persons currently engaged in illicit drug use. *See* 42 U.S.C. § 12210(a) (ADA); 42 U.S.C. § 3602(h) (FHA). Relevant to the case at hand, however, both Acts provide that individuals participating in a supervised rehabilitation program and no longer using drugs are protected. *See* 42 U.S.C. § 12210(b)(2) (ADA); *United States v. Southern Mgmt. Corp.*, 955 F.2d 914, 920–23 (4th Cir. 1992) (acknowledging that residents of a supervised drug rehabilitation program meet the definition of handicapped under the FHA because the FHA covers recovering drug users but not current abusers).

As BCSAD alleges, all RSATPs "require, as a condition of admission, that patients have functional deficits that render them unable to care for themselves outside of a therapeutic residential environment." (BCSAD Mem. Supp. Mot. Summ. J. 31–32); *see also* COMAR 10.47.02.06(B)(2). This level of impairment amounts to substantial limitation of major life activities. In addition, the admission criteria for RSATPs established by Maryland law specifically requires residents to be disabled. *See* COMAR 10.47.02.06(B)(2).

Even when individuals would otherwise fall within the class of statutorily protected persons, both the ADA and FHA exclude individuals who pose a significant risk to the health or

safety of others. 42 U.S.C. § 12131 (ADA); 42 U.S.C. § 3604(f)(9) (FHA). In *School Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273 (1987), the Supreme Court developed the significant risk test for assessing when an individual poses a risk of a level that excludes that individual from statutory protection against discrimination. *Id.* at 287. Under this test, treating an individual who poses a significant risk to others differently does not constitute illegal discrimination so long as the risk to the health and safety of others cannot be eliminated or reduced to an acceptable level by reasonable accommodation and so long as the risk assessment is not based on unsupported fears or stereotypes. *Id*. at 288. Although *Arline* dealt with a Rehabilitation Act claim alleging wrongful discharge based on disability after an employee contracted tuberculosis, the significant risk test has also been applied to alleged zoning discrimination under the ADA. *See Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,* 179 F.3d 725 (9th Cir. 1999) (applying the significant risk test in a case alleging discriminatory zoning practices).

The significant risk test "requires an individualized assessment of the facts . . . to achieve [the] goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns . . . as avoiding exposing others to significant health and safety risks." *Bay Area*, 179 F.3d at 735 (quoting *Arline*, 480 U.S. at 287). Courts have acknowledged that in the context of discrimination against substance abusers there is a potential to rely on fears and stereotypes to support claims of safety risks. *See New Directions,* 490 F.3d at 303 ("[F]ew aspects of a handicap give rise to the same level of public fear and misapprehension as the challenges facing recovering drug addicts.") (internal citations omitted). Thus, courts have required sufficient evidence that "reflect[s] a risk that is significant and harm that is serious." *Id*. (quoting *Bay Area*, 179 F.3d at 737).

14

Assessing whether the risk is significant and the harm serious requires "a rigorous objective inquiry" where the court focuses on "objective evidence in the record of any dangers posed" and does not focus merely on "subjective judgments of the people purportedly at risk." *Id*. at 305–06 (citing *Bragdon v. Abbott*, 524 U.S. 624, 626 (1998)). Courts therefore should look at the nature, duration, and severity of the risk. *See Bay Area*, 179 F.3d at 736–37 (evaluating evidence of the likelihood of a significant increase in crime to determine whether a methadone clinic poses a significant risk to the community). Furthermore, not only must the evidence be objective and show a significant risk, it must also demonstrate that the risk is one of substantial harm. *Id.* (noting skepticism that evidence of increased traffic, loitering, noise pollution, littering, double parking, and jaywalking would "qualify as substantial harms").

Here, the City has not shown, indeed it has not attempted to show, that substance abusers *per se* pose a significant risk to the health or safety of others. Thus, substance abusers are not by virtue of their condition excluded from the protection against discrimination afforded by the ADA and FHA. What the City does contend is that the presence of a large number of substance abuse residents who have been referred by a drug court in lieu of criminal prosecution is a relevant factor in determining the analogous uses that should be referred to in deciding whether the requirement that an RSATP obtain a CO is discriminatory on its face. That is a separate question that will be addressed in the next section.

  C. *The Merits*

According to Plaintiffs, RSATPs are discriminated against because the Zoning Code does not impose a requirement for obtaining a CO upon comparable uses. Conceptually, that contention is correct. On its face, the Zoning Code draws no distinction between the sizes of RSATPs in imposing the CO requirement. Therefore, the CO requirement is facially discriminatory. As a

15

factual matter, however, the record establishes that for zoning purposes the City draws a distinction between "larger" RSATPs, i.e., those that house 17 or more residents, and "smaller" RSATPs, i.e., those that house 16 or fewer residents. In practice, the city only requires the former to obtain a CO. Of course, for purposes of theoretical analysis that makes no difference. It is somewhat ironic that the City seems to interpret the Zoning Code to prevent is discriminatory application. More commonly, if a facial discrimination claim fails, plaintiffs allege that a defendant applies facially neutral language in a discriminatory fashion. *See, e.g.*, *New Directions*, 490 F.3d 293 (raising both a facial and as-applied challenge to Pennsylvania zoning statute); *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295 (11th Cir. 2006) (assessing as-applied challenge after plaintiff concedes zoning provision at issue is facially neutral); *Smith & Lee Assocs. v. City of Taylor, Mich.*, 13 F.3d 920 (6th Cir. 1993) (discussing the proper analytical framework when the ordinance at issue is facially neutral); *U.S. v. District of Columbia*, 538 F. Supp. 2d 211 (D.D.C. 2008) (noting that plaintiff abandoned facial challenge and proceeded instead on an as-applied theory). But the City has cited no authority, and I am aware of none, that supports the proposition that a facially discriminatory statute can be saved by non-discriminatory application.

Nevertheless, as discussed in the next section, in my judgment selection of the proper remedy turns on whether the CO requirement is discriminatory as applied to larger RSATPs. Ordinarily, if statutory language is facially discriminatory, a court strikes the language. If, however, the CO requirement is not discriminatory as applied to larger RSATPs, striking the CO requirement would benefit persons who have not been harmed, i.e. larger RSATPs, and deprive the City of a zoning tool that it may properly use in making zoning decisions. Therefore, in

order to select the appropriate remedy, I must consider whether the CO requirement is discriminatory as to larger RSATPs.

I conclude that it is not. Plaintiffs contend that RSATPs should be analogized to apartment buildings upon which a CO requirement is not imposed.[7] The City, conversely, argues that the uses to which RSATPs should be compared are nursing homes and community correctional facilities, which do require COs. Plaintiffs' contention is not illogical because the most obvious difference between an apartment building and an RSATP is that only persons with known disabilities reside in the latter. On the other hand, the City's position is equally plausible. RSATPs, unlike unlicensed supportive housing, do involve a medical component. Therefore, they are somewhat comparable to nursing homes. Moreover, many of the residents of RSATPs have been referred by the City's drug court in lieu of criminal prosecution, and many have at least one felony conviction and are under continuous monitoring. Therefore, in some respects RSATPs are analogous to community correctional facilities.

Plaintiffs point to the fact that some of the residents in smaller RSATPs likewise have been referred to placement there by the drug court. There is no evidence, however, that at the time zoning decisions are made the City's zoning authorities are advised that the proposed residents are being referred by the drug court. More importantly, this is an issue in which perhaps it can be reasonably said that sheer numbers may make a difference. It might be that reasonable persons would conclude that only a few residents referred by a drug court to a smaller RSATP do not pose a significant risk to the health or safety of others, particularly if they have no criminal record, but that the presence of a large number of residents referred to a larger RSATP

---

[7] Plaintiffs also suggest that hospitals constitute a comparable use. As Plaintiffs acknowledge, however, hospitals are places for temporary stay, not residences.

by a drug court do pose a significant risk to the health or safety of others.  Resolution of this question is extremely fact intensive, and it is best resolved by closely focusing on the location and structure of a particular RSATP, the nature and criminal history of the residents who will be living there, and the extent of monitoring that is to be done by members of the RSATP's staff.

These are inquiries that can be made during the CO approval process.  Of course, if an RSATP does not obtain a CO and believes that it did not succeed in doing so because of stereotypical thinking engaged in by members of nearby community associations, it may bring a suit in federal court under the ADA or FHA to challenge the decision not to grant a CO.  A specific decision will then be made on its own merits, and federal law necessarily will prevail over the provisions of the Zoning Code, even if the reason that a CO was not obtained by an RSATP was the refusal of a member of the City Council to introduce legislation authorizing the CO.  It is, however, a far different thing for a federal court to evaluate the merits of a particular decision in a particular factual context than for a federal court to strike a zoning ordinance facially when, in fact, the record before it establishes that no discrimination has occurred.  In the former instance, a court is performing its constitutional duty to assure that federal rights are not undermined by local prejudice.  In the latter, the court would be unnecessarily injecting itself into a situation where due deference to local zoning decisions cautions prudence and discretion.[8]

---

[8] There are two other ways to analyze this case.  First, although the City may deem RSATPs to be "homes for non-bedridden alcoholics" for zoning purposes, as noted in text, an RSATP is not such a home unless a substance being abused by its residents is alcohol, rather than another drug such as heroin.  Therefore, in order to glean the meaning of the phrase "homes for non-bedridden alcoholics," arguably it is necessary to refer to all of the evidence pertaining to the City's zoning treatment of RSATPs.  This evidence, considered in its totality, demonstrates that the City does not deem all RSATPs to be "homes for non-bedridden alcoholics" but only those RSATPs that house 17 or more residents or smaller RSATPs that self-identify as RSATPs when seeking zoning under a different classification, i.e. as a single-family dwelling.  This analysis yields precisely the same result as does the analysis I adopt in the text of this Opinion.  There is no

18

## IV.     The Appropriate Remedy

For these reasons, I find that the City does not discriminate against larger RSATPs in requiring them to obtain a CO.[9] Likewise, the record appears to establish that the City does not discriminate against smaller RSATPs that do not self-identify as RSATPs in their zoning applications because the City permits them to locate through other zoning classifications for which they are eligible. The City does, however, discriminate against RSATPs who do self-identify as RSATPs in their zoning applications, because in order to avoid the requirement that these RSATPs obtain a CO, the City requires them to go through the City's reasonable accommodation process. Although the record establishes that RSATPs falling in this category have successfully obtained relief, the reasonable accommodation process itself is a burden, imposing additional costs and delay.

---

discrimination suffered by larger RSATPs because they are treated the same as what I find to be comparable uses, and there is no discrimination suffered by smaller RSATPs that do not self-identify as RSATPs because they are able to obtain zoning without going through the City's reasonable accommodation process. Thus, the only RSATPs that suffer discrimination are smaller RSATPs that do self-identify as RSATPs and therefore must suffer the costs and delay caused by the City's reasonable accommodation policy. For these smaller facilities, having to avoid self-identifying, or being incentivized to not self-identify, is evidence of discrimination.

Alternatively, it could be argued that because RSATPs that provide residences for persons battling abuse of substances other than alcohol are not "homes of non-bedridden alcoholics," the defect in the Zoning Code is that it discriminates against persons protected by the ADA and the FHA because it contains no provision authorizing such RSATPs from being located in any zoning district in the City. Again, however, this analysis leads to the same result as the analysis I have adopted in the text, except that because there is no provision in the Code for larger RSATPs that are not "homes for non-bedridden alcoholics" to obtain a CO, the remedy for a larger RSATP aggrieved by not being permitted to locate in the City would be to bring an action in this Court under the ADA and the FHA without first attempting to obtain a CO.

[9] As noted in footnote 5, one smaller RSATP, Powell Recovery Center, was required to obtain a CO, but that occurred seven years ago and does not appear to reflect the City's current practice. The City also eventually offered Powell Recovery Center a reasonable accommodation, but the Center secured a CO, making any additional process unnecessary.

19

Therefore, it is necessary that the language of the Zoning Code be modified to reflect, as is consistent with what the record discloses is the City's actual practice, that the CO requirement applies only to larger RSATPs that are not eligible to locate as a permitted use under another zoning classification. Attempts to amend the Zoning Code have failed in the past, and at oral argument counsel for the City candidly stated that he cannot represent when the process of revising the Code, which is presently underway, will be completed. Therefore, a court order is required to assure that the necessary modification to the Code be promptly made. However, out of respect for the City Council, and in accordance with principles of federalism and the separation of powers, I will provide the Council with the opportunity to enact legislation within 60 days of the issuance of this Opinion to make the statutory modification I believe is necessary. If the legislation is not enacted within that time period, I will enter an order (after counsel have submitted proposed language to me) that effects the modification.

A separate order incorporating my rulings is being entered herewith.


February 29, 2012                              /s/
Date                                           J. Frederick Motz
                                               United States District Judge